Alan and Elizabeth GREEN, et al.

v.

STATE TAX ASSESSOR.

Supreme Judicial Court of Maine.

Argued June 9, 1989.
Decided July 17, 1989.

John W. Geismar, Michael A. Worden (orally) Isaacson & Raymond, P.A., Lewiston, for plaintiffs.

James E. Tierney, Atty. Gen., Polly Haight Frawley (orally), Asst. Atty. Gen., Augusta, for defendant.

Before WATHEN, GLASSMAN, CLIFFORD, HORNBY and COLLINS, JJ.

WATHEN, Justice.

Plaintiffs Alan and Elizabeth Green and Donald and Sandra Kurson, non-resident taxpayers in Maine, appeal from a decision and order of the Superior Court (Androscoggin County, *Alexander, J.*) affirming a decision of the State Tax Assessor assessing additional taxes against plaintiffs and denying plaintiffs' claims for refunds. Plaintiffs argue on appeal that the Assessor erroneously interpreted Maine income tax law to permit a deduction for Maine source losses only in the year that the taxpayer deducts those losses on his federal income tax return. Plaintiffs argue, in the alternative, that the Assessor's interpretation violates both the privileges and immunities clause and the equal protection clause of the federal constitution. We affirm the judgment.

## I.

Each of the plaintiffs is a nonresident of the State of Maine. Plaintiffs Alan Green and Donald Kurson are partners in two Massachusetts partnerships. One of the partnerships operates the Turnpike Mall in Augusta; the other operates the Lewiston Mall. Plaintiffs derive all of their Maine source income from these business activities.

Plaintiffs filed State of Maine income tax returns for the years 1979 to 1985. Plaintiffs later amended their Maine income tax returns, requesting refunds for most of those tax years. The Assessor assessed a deficiency against plaintiffs Green for the year 1983 and against plaintiffs Kurson for the year 1984 and denied their requests for refunds. Plaintiffs sought reconsideration of the assessment of tax deficiencies and the denial of refunds pursuant to 36 M.R.S.A. § 151 (Supp.1988–1989). The Assessor denied reconsideration and plaintiffs thereafter brought suit for review of final agency action pursuant to M.R.Civ.P. 80C. Following oral argument the Superior Court denied plaintiffs' appeal and affirmed the decision of the Assessor.

The source of the disputed tax liability is plaintiffs' attempt to carry forward operating losses realized in Maine during previous years in which plaintiffs could not deduct the losses on their Maine income tax returns due to insufficient Maine source income. The parties agree that plaintiffs had deducted the losses in question on their federal income tax returns in previous years by setting them off against non-Maine source income. The Assessor disallowed the losses, interpreting Maine tax law to permit taxpayers to deduct losses on their Maine income tax return only in the year that they deduct the same losses on their federal income tax returns. In a well reasoned decision, the Superior Court upheld the Assessor's interpretation. The court found that Maine income tax law prohibits both residents and non-residents from carrying forward losses if those losses are not also entered on their federal income tax returns for the same tax year. Based on that finding, the court rejected plaintiffs' argument that the Assessor's interpretation of the Maine income tax law violates the privileges and immunities clause and the equal protection clause of the federal constitution.

## II.

██ In *Kelley v. Halperin*, 390 A.2d 1078 (Me.1978), we recognized "that the construction of a statute utilized by those whose duty it is to make the statute operative is entitled to great deference by a court when called upon to construe the statute." *Id.* at 1080. In *Kelley*, we upheld the Assessor's interpretation of the inheritance tax law stating "[s]ince there is nothing in the language of this enactment

which makes the interpretation given by the State Tax Assessor contrary to expressed legislative purpose, it is entirely appropriate to look to its contemporaneous construction by the defendant as a guide." *Id.* (citing *Mottram v. State*, 232 A.2d 809, 816 (Me.1967).

The Maine Income Tax Code does not explicitly provide for the carry forward or carry back of net operating losses. 36 M.R.S.A. §§ 5101–5192 (1978 & Supp.1988–1989). Under Maine law, the starting point for determining Maine adjusted gross income is the figure for adjusted gross income appearing on the taxpayer's federal income tax return in a given tax year. 36 M.R.S.A. § 5102(1–C) (Supp.1988–1989). In the case of a nonresident " 'Maine adjusted gross income' means ... that part of his federal adjusted gross income derived from sources within this State, as determined under section 5142." *Id.* § 5102(1–C)(B). Section 5142 provides in pertinent part as follows:

> 1. General. The adjusted gross income of a nonresident derived from sources within this State shall be the sum of the following:
>
>> A. The net amount of items of income, gain, loss, and deduction *entering into his federal adjusted gross income* which are derived from or connected with sources in this State including (1) his distributive share of partnership income and deductions determined under section 5192 ....

*Id.* § 5142(1)(A) (Supp.1988–1989) (emphasis supplied). Section 5142 further provides that "[d]eductions with respect to ... net operating losses shall be based solely on income, gains, losses, and deductions derived from or connected with sources in this State, under regulations to be prescribed by the assessor but otherwise shall be determined in the same manner as the corresponding federal deductions." *Id.* § 5142(4) (1978). Section 5192, defining the "Maine adjusted gross income" of a nonresident partner similarly provides:

> In determining the adjusted gross income of a nonresident partner of any partnership, there shall be included only that part derived from or connected with sources in this State of the partner's distributive share of items of partnership income, gain, loss and deduction *entering into his federal adjusted gross income*, as such part is determined under regulations prescribed by the assessor in accordance with the general rules in section 5142.

*Id.* § 5192 (1978) (emphasis supplied). No regulations have been prescribed by the tax assessor pursuant to section 5142 or 5192.

Given that the Maine Income Tax Code provides that the starting point for determining the nonresident taxpayer's "Maine adjusted gross income" is his federal adjusted gross income, it is necessary to examine the relevant provisions of the Internal Revenue Code. "Adjusted gross income" for federal income tax purposes is defined as "gross income" minus certain specified deductions, including certain deductions "which are attributable to a trade or business ...." 26 U.S.C. § 62(a)(1) (1988). Individual taxpayers may deduct "losses incurred in a trade or business." *Id.* § 165(a), (c)(1). In computing adjusted gross income, net operating losses may be carried back to each of the three years preceding the tax year in question and carried forward for fifteen years if the loss was incurred during any tax year ending after December 31, 1975. 26 U.S.C. § 172(a), (b), (1)(A), (B). The amount that may be carried forward or back is the excess of the loss "over the sum of the taxable income for each of the prior taxable years to which such loss may be carried." *Id.* § (b)(2).

Because the "Maine adjusted gross income" of a nonresident taxpayer is derived from federal adjusted gross income and only the federal code provides for the carry over of losses, a nonresident taxpayer may only carry over on his Maine income tax return those losses recognized on his federal income tax return for the same tax year. If the loss is not "entered into" the computation of the taxpayer's federal adjusted gross income in the tax year in question, there is simply no basis for taking the loss

into account in computing Maine adjusted gross income.

This conclusion is supported by our decision in *Tiedmann v. Johnson,* 316 A.2d 359 (Me.1974). In *Tiedmann,* the taxpayer realized gain from the sale of his house in February, 1969 but deferred recognition of a portion of his gain on his federal income tax return under the installment method of accounting to the tax years 1970 through 1972. The Maine Income Tax Code did not become effective as to noncorporate taxpayers until July, 1969. The taxpayer argued that the Legislature did not intend to impose tax liability for gains realized prior to the effective date of the Maine Income Tax Code simply because their recognition under federal income tax law was deferred. We concluded that the Legislature adopted "federal adjusted gross income as the standard for 'entire taxable income' ... [in order to avoid the] creation of a unique or complicated income tax scheme." *Id.* at 364. We explicitly rejected in *Tiedmann* the argument advanced by plaintiffs in the present case that 36 M.R.S.A. § 5102(11) demonstrates that the Maine Legislature intended that Maine income tax law mirror the federal scheme of income taxation. *Id.* at 365 n. 10.

### III.

Plaintiffs argue, in the alternative, that the Assessor's interpretation of the Maine Income Tax Code violates the federal constitution. Specifically, plaintiffs argue that the disparity in treatment between nonresident and resident taxpayers violates both the privileges and immunities clause and the equal protection clause of the federal constitution.

" 'Maine adjusted gross income' means, for a resident individual, the federal adjusted gross income of that individual, as modified by section 5122." 36 M.R.S.A. § 5102(1–C)(A). The taxpayer's federal adjusted gross income thus provides the starting point for determining "Maine adjusted gross income" for both residents and nonresidents. In addition, in computing Maine adjusted gross income, both modify their federal adjusted gross income

by the provisions of section 5122. Both residents and nonresidents may therefore deduct net operating loss carryovers only in the year that those losses appear on the taxpayer's federal income tax return. Any disparity in treatment for purposes of deducting net operating losses results from the fact that the Maine adjusted gross income of a resident taxpayer derives from his entire federal adjusted gross income whereas that of a nonresident taxpayer derives only from Maine source income, losses, and deductions. As a practical matter, a resident taxpayer will offset the same amount of loss on both his federal and state returns. Accordingly, the resident will not have unclaimed losses that have been fully exhausted on his federal return in previous years.

The privileges and immunities clause of Article IV of the United States Constitution provides that "[the] Citizens of each State shall be entitled to all the Privileges and Immunities of Citizens in the several States." U.S. Const. art IV, § 2. Although the language of the clause deals only with citizenship whereas plaintiffs' argument deals with residency, "it is now established that the terms 'citizen' and 'resident' are 'essentially interchangeable' for purposes of analysis of most cases under the Privileges and Immunities Clause." *United Building & Construction Trades Council v. Mayor of Camden,* 465 U.S. 208, 216, 104 S.Ct. 1020, 1026, 79 L.Ed.2d 249 (1984) (citations omitted).

In applying the privilege and immunities clause to a particular instance of alleged discrimination against nonresidents, we must first "decide whether the ordinance burdens one of those privileges and immunities protected by the Clause." *United Building & Construction Trades Council v. Mayor of Camden,* 465 U.S. at 218, 104 S.Ct. at 1027. The fact that the challenged legislation does discriminate against a protected privilege, however, does not end the inquiry. *Id.* at 222, 104 S.Ct. at 1029. As the Court explained in *Toomer v. Witsell:*

[T]he privileges and immunities clause is not an absolute. It does bar discrimina-

tion against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether the degree of discrimination bears a close relation to them.

*Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). In addition, "[i]n deciding whether the discrimination bears a close or substantial relationship to the State's objective, the Court has considered the availability of less restrictive means." *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 284, 105 S.Ct. 1272, 1278, 84 L.Ed.2d 205 (1985).

█ The rights protected by the privileges and immunities clause of article IV include the right to be free from discriminatory taxation. In *Corfield v. Coryell,* 6 F.Cas. 546 (E.D.Pa.1823 (No. 3230), the first major case construing the clause the court stated:

> The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental ....

*Id.* at 552.

█ The decisions of the United States Supreme Court indicate that not all differentiation between residents and nonresidents for purposes of state taxation constitutes discriminatory treatment in violation of the privileges and immunities clause. In *Travellers' Insurance Co. v. Connecticut,* 185 U.S. 364, 22 S.Ct. 673, 46 L.Ed. 949 (1902), for example, the State of Connecticut assessed the stock of resident and nonresident shareholders at its market value but from that figure deducted, for nonresidents only, the proportionate value of all real estate held by the corporation upon which it had already paid a tax. The Court considered the apparent discrimination in light of Connecticut's system of taxation. A nonresident paid no local tax but did pay a state tax at a fixed rate of 15 mills on the dollar. A resident paid no state tax but did pay a local tax at an average rate of 15 mills on the dollar, which varied with the municipality. The Court upheld the scheme of taxation reasoning that "[t]he resident is not called upon to pay any of the expenses of the State, but only to bear his proportional share of those of the municipality. The non-resident is called upon to pay no share of the expenses of the municipality, but only to contribute to the support of the State." *Id.* 185 U.S. at 368–69, 22 S.Ct. at 674–75. The Court stated that "the mere fact that in a given year the actual workings of the system may result in a larger burden on the non-resident was properly held not to vitiate the system, for a different result might obtain in a succeeding year ...." *Id.* at 369, 22 S.Ct. at 675. The Court explained further:

> [T]he validity of this legislation does not depend on the question whether the courts may see some other form of assessment and taxation which apparently would result in greater equality of burden. The courts are not authorized to substitute their views for those of the legislature. We can only consider the legislation that has been had, and determine whether or no its necessary operation results in an unjust discrimination between the parties charged with its burdens. *It is enough that the State has secured a reasonably fair distribution of burdens and that no intentional discrimination has been made against non-residents.*
>
> ... *[M]ere inequality in the results of a state tax law is not sufficient to invalidate it.*

*Id.* at 371, 22 S.Ct. at 676 (emphasis supplied).

In *Shaffer v. Carter*, 252 U.S. 37, 40 S.Ct. 221, 64 L.Ed. 445 (1920) the Court used similar reasoning in rejecting the petitioner's claim of unconstitutionality. In *Shaffer*, the petitioner contended that the Oklahoma Income Tax Law violated both the privileges and immunities clause of article IV and the equal protection clause of the fourteenth amendment. The law permitted residents to deduct from their gross income all losses, wherever incurred, but permitted nonresidents to deduct losses incurred in Oklahoma only. The Court specifically noted that the difference in treatment did not result from unfriendly discrimination.

> The difference ... is only such as arises naturally from the extent of the jurisdiction of the State in the two classes of cases, and cannot be regarded as an unfriendly or unreasonable discrimination. As to residents it may, and does, exert its taxing power over their income from all sources, whether within or without the State, and it accords to them a corresponding privilege of deducting their losses, wherever these accrue. As to nonresidents, the jurisdiction extends only to their property owned within the State and their business, trade, or profession carried on therein, and the tax is only on such income as is derived from those sources. Hence there is no obligation to accord to them a deduction by reason of losses elsewhere incurred.

*Id.* 252 U.S. at 57, 40 S.Ct. at 227.

In *Travis v. Yale*, 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920), a companion case to *Shaffer*, the Court reached the opposite result. In *Travis*, the New York Income Tax Law granted residents exemptions in varying amounts depending on such factors as marital status and number of dependents. The law granted no similar exemption to nonresidents. The Court concluded that the provisions in question discriminated against nonresidents as a class and affirmed the ruling of the District Court that they violated the privileges and immunities clause. The Court stated, "[t]his is not a case of occasional or accidental inequality due to circumstances personal to the taxpayer; but a general rule, operating to the disadvantage of all non-residents including those who are citizens of the neighboring States, and favoring all residents including those who are citizens of the taxing State." *Id.* 252 U.S. at 80–81, 40 S.Ct. at 232–32 (citations omitted).

More recently, in *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975), the Court struck down a New Hampshire Commuter's Income Tax, the burden of which fell exclusively on nonresidents. New Hampshire imposed a tax on nonresidents' New Hampshire source income in excess of $2,000. The tax rate was 4% unless the State of residence would impose a lesser tax had the income been earned in that State, in which case the tax was reduced to that amount. Employers were required to withhold the 4% even where the State of residence would impose a lesser tax. The excess tax withheld was refunded upon the nonresident's filing a New Hampshire tax return. The Commuter's Income Tax also imposed a tax of 4% on the income earned by New Hampshire residents out of State. It then exempted such income from taxation. The effect of the scheme therefore was to tax only the incomes of nonresidents working in New Hampshire.

The Court first noted that "in taxation, even more than in other fields, legislatures possess the greatest freedom in classification," *id.* 420 U.S. at 661–62, 95 S.Ct. at 1195–96 (quoting *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940), and that the Court's review is, therefore, "concomitantly narrow." *Id.* 420 U.S. at 662, 95 S.Ct. at 1195. The Court then noted that distinctions between residents and nonresidents, however, are subject to "a standard of review substantially more rigorous than that applied to state tax distinctions among, say, forms of business organizations or different trades and professions." *Id.* at 663, 95 S.Ct. at 1196. The Court next noted that prior decisions do not require absolute equality but instead "establish[ ] a rule of substantial equality of treatment for the citizens of the

taxing State and nonresident taxpayers ...." *Id.* at 665, 95 S.Ct. at 1197. In striking down the legislation the Court rejected the State's argument that the ultimate tax burden was no more onerous in effect on nonresidents "because their total state tax liability [was] unchanged once the tax credit they receive[d] from their State of residence [was] taken into account." The Court stated that the argument could not "be squared with the underlying policy of comity to which the Privileges and Immunities Clause commits us." *Id.* at 666, 95 S.Ct. at 1197.

In *Barney v. State Tax Assessor,* 490 A.2d 223 (Me.1985), we considered a challenge, on privileges and immunities grounds, to various provisions of the Maine Income Tax Code that required a nonresident to prorate his deductions and exemptions according to the ratio of his Maine-earned income to total income. During the tax years in question, the nonresident taxpayers earned 74% and 72.5% of the adjusted gross income declared on their federal return in Maine. Accordingly they were permitted to deduct and exempt only 74% and 72.5% respectively of the deductions they would have been allowed as residents. We rejected the nonresident taxpayers' contention that Maine had denied them substantial equality of treatment. We concluded that "Maine's proration scheme [is] 'not more onerous in its effect' upon nonresidents ... [and] it also effects a clearly sufficient State purpose, *viz,* 'funding no more than that share of tax benefits that is attributable to income earned within, and therefore taxable by Maine." *Id.* at 225 (citations omitted). We did not agree with the taxpayers' contention that Maine's scheme imposed a higher effective rate of tax on nonresidents than on similarly situated residents and reasoned that "Maine's scheme is neutral in its effect on residents and non-residents. Looking at any non-resident taxpayer's total income, it is clear that any variation between his effective rate and that of a similarly situated Maine resident will depend on his own State's base rate and tax benefit policy." *Id.*

In light of the principles enunciated in these cases we conclude that the Maine Income Tax Code does not violate the privileges and immunities clause. Although the Maine Income Tax Code does permit some disparity of treatment between residents and nonresidents, as is illustrated by the present case, it satisfies the requirement of "substantial equality of treatment" established by the Supreme Court. The Maine Income Tax Code does not intentionally discriminate against nonresidents nor disfavor them as a class. As noted, both residents and nonresidents may deduct net operating losses on their Maine income tax return only in the year that those same losses appear on the taxpayer's federal income tax return. The difference in the definition of Maine adjusted gross income for residents and nonresidents results from the "extent of the jurisdiction of the State in the two classes of cases." The disparity in treatment in the present case is an example of "accidental inequality" due to the "personal circumstances" of the plaintiffs. Plaintiffs were prevented from carrying forward their Maine source losses to subsequent tax years in which they had sufficient Maine source income to offset the losses only because they had sufficient other income to exhaust the losses on their federal returns in previous years. Had plaintiffs had less non-Maine income they would not have been prevented from carrying over their Maine source losses. In addition, as in *Barney,* any difference in plaintiffs' overall rate of state taxation and that of a Maine resident with comparable federal adjusted gross income depends on the rate of taxation imposed by plaintiff's state of residence. Moreover, while it is true that the Maine Legislature could provide for a system of income taxation resulting in greater equality of treatment, there is a "valid independent reason" for the system as it exists. In *Tiedmann v. Johnson,* 316 A.2d at 362–64, we adopted the following argument advanced by the Tax Assessor:

> [B]y adoption of federal adjusted gross income as the standard by which Maine income would be measured, the Legislature purposefully sought to simplify the

entire Maine tax assessment and collection system by utilizing a clear objective criterion, and thus avoiding the pits and falls which accompany administrative or judicial inquiries into the 'nature' or 'origin' of particular items of individual income.

*Id.* at 362. Furthermore, the Maine Legislature could not achieve its purpose of a simplified tax scheme and, at the same time, eliminate all possibility that a disparity in treatment might occur. It thus appears that there are no "less restrictive means" by which the Legislature could achieve its purpose.

 Plaintiffs also argue that the Maine Income Tax Code deprived them of the equal protection of the laws in violation of the fourteenth amendment. The equal protection clause provides that "[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14. "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions ..., [the Supreme Court's] decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *McNicholas v. York Beach Village Corp.,* 394 A.2d 264, 268 (Me.1978) (quoting *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976)). Plaintiff does not contend that the alleged disparity in treatment between residents and nonresidents in the present case involves either a fundamental right or a suspect classification. In addition, the fact that a nonresident's right to be free from higher taxes is deemed fundamental for purposes of the privileges and immunities clause does not mean that it is fundamental for purposes of the equal protection clause. A well known commentator on constitutional law has stated: "This is not to say that the list of fundamental privileges and immunities under article IV is co-extensive with the very limited list of fundamental interests recognized by equal protection doctrine. Indeed if it took a fundamental equal protection interest to trigger article

IV, § 2, the privileges and immunities clause would be superfluous." L. Tribe, *American Constitutional Law* § 6–35, at 535 (1988).

The statutory provisions at issue in the present case survive the rational basis test. The State's objective of providing for a relatively simple method of assessing income tax is legitimate. The challenged provisions are rationally related to that legitimate state interest. In analyzing alleged discrimination in New Jersey's method of taxing property belonging to the estate of a nonresident decedent the Supreme Court stated:

> The question of equal protection must be decided as between resident and nonresident decedents as classes, rather than by the incidence of the tax upon the particular estates whose representatives are here complaining. Absolute equality is impracticable in taxation, and is not required by the equal protection clause. And inequalities that result not from hostile discrimination, but occasionally and incidentally in the application of a system that is not arbitrary in its classification, are not sufficient to defeat the law.

*Maxwell v. Bugbee,* 250 U.S. 519, 543, 40 S.Ct. 1, 7, 63 L.Ed. 1123 (1919).

The entry is:

Judgment affirmed.

All concurring.